ATTACHMENT B

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
Boston, Massachusetts

File No.: A 73 626 402                         December 28, 2001

In the Matter of                  )
                                  )
ABDELAZIZ BENNOUR,                )   IN REMOVAL PROCEEDINGS
                                  )
         Respondent               )

CHARGE:        Section 237(a)(1)(B) of the Immigration and
               Nationality Act, as amended -- Non-immigrant --
               remained longer than permitted

APPLICATION:   Withholding of removal; voluntary departure and
               the Convention Against Torture

ON BEHALF OF RESPONDENT:        ON BEHALF OF SERVICE:

Pro se                          Susan J. Hiller, Esquire
                                Assistant District Counsel
                                Immigration and Naturalization
                                   Service
                                Boston, Massachusetts

## ORAL DECISION OF THE IMMIGRATION JUDGE

Respondent is a 33-year-old, single male alien, native and citizen of Algeria who was admitted to the United States at New York, New York on July 13, 1997 as a non-immigrant fiancé with authorization to remain in the United States for a temporary period not to exceed October 12, 1997.

Respondent has conceded allegations 1 through 3 in his Notice to Appear, Exhibit 1 in the record, are true as stated, which read as follows: "(1) You are not a citizen or national of

ccm

the United States. (2) You're a native of Algeria and a citizen of Algeria. (3) You were admitted to the United States as at New York, New York on or about July 13, 1997 as a non-immigrant fiancé with authorization to remain in the United States for a temporary period not to exceed October 12, 1997." Respondent denied the truthfulness of allegations 4 and 5 in his Notice to Appear, which read as follows: "(4) On April 20, 1998 your application for permanent residence based on your marriage to Deborah Sunderman was denied. (5) You remained in the United States beyond October 12, 1997 without authorization from the Immigration and Naturalization Service." The respondent denied that he is subject to removal on the charge contained in his Notice to Appear, which reads as follows: "Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a non-immigrant under Section 101(a)(15) of the Act you have remained in the United States for a longer time than permitted."

The burden is on the Government to establish that the allegations in the Notice to Appear are true as stated and that the respondent is subject to removal on the charge contained therein by evidence which is clear and convincing. See the Immigration and Nationality Act of 1990, as amended; 8 C.F.R. § 242.14.

Exhibit 2 in the record contains the respondent's I-94 showing he was admitted to the United States as a fiancé on July

A 73 626 402                           2                   December 28, 2001

ccm

13, 1997 without authorization to remain in the United States until October 12, 1997. The document reflects that the respondent is a citizen of Algeria born December 20, 1968, containing the respondent's name. Exhibit 3 in the record contains the denial application for permanent residence in the name of the respondent dated April 20, 1998. Exhibit 4 in the record contains an annulment judgment in the name of the respondent which was filed by the woman that he married, Deborah A. Sunderman, dated July 17, 1998.

Based on the foregoing and what is contained in the record, I find that the respondent is not a citizen or national of the United States, but a native and citizen of Algeria who was admitted to the United States at New York, New York on July 13, 1997 as a non-immigrant fiancé with authorization to remain in the United States for a temporary period not to exceed October 12, 1997, whose application for permanent residence was denied on April 20, 1998, and that the respondent has remained in the United States beyond October 12, 1997 without authorization from the Immigration and Naturalization Service. I further find that the respondent is subject to removal on the charge contained in his Notice to Appear by evidence which is clear and convincing.

Respondent applied for discretionary relief in the form of withholding of removal, voluntary departure and the Convention Against Torture. The respondent has submitted an application, form I-589, initially requesting asylum. The respondent is

ccm

statutorily ineligible for asylum. The respondent filed his application, form I-589, before the Immigration Judge undersigned, as reflected in Exhibit 7, on May 16, 2000. The respondent was required to submit that application within a year of December 9, 1998. The respondent has not submitted any evidence or documentation to establish why he did not file that application within the one year. There is nothing in this record to establish that the respondent is excused from filing that application. Consequently, he is statutorily ineligible to apply for political asylum.

Assuming that it was concluded from the record that the respondent was excused from the one year filing deadline and he was statutorily eligible to apply for asylum, his application for that relief will be visited by the undersigned as set forth in the record.

Exhibit 7 in the record is form I-589 which, for purposes of the decision, assuming that the respondent was found to be eligible to apply for asylum, will be entertained as an asylum application, application for withholding of removal and the Convention Against Torture. Review of Exhibit 7 reflects the following: respondent was born on December 20, 1968 in Algiers, Algeria; that his marital status is not indicated; that he is an Algerian national at the present and was born in Algeria; that he last left his country in 1997 and that he entered the United States with a fiancé visa at New York, New York on July 13, 1997

A 73 626 402                                    4                      December 28, 2001

ccm

with authorization to stay in the United States until October 12, 1997. A review of the respondent's I-589 reflects that he attended a school in Italy with no dates given. The I-589 indicates that the respondent's parents are both natives and citizens of Algeria located in Alger, presumably Algeria. Part C, question 1 of the form I-589 asked the question why are you seeking asylum with the following written in: "The reason I am seeking asylum and withholding deportation is I was living in Italy from 1990 to 1997 and I returned to my own country, Algeria, with residence papers from Italy. One day I was visiting my friends outside of Algeria about 45 or 55 kilometers in Davira. I took a taxi to get back home. When I was in the taxi, there was the driver, another passenger and myself. Along the way the military border patrol stopped us and asked us for papers, IDs and licenses, etc. All was fine."

"Further down the road, there was another border patrol. All was not fine with them. They were military impersonators. I recognized this when they asked for papers and we produced what they wanted. They continued to ask us questions individually asking where we were coming from, where we were going, did we support the government or terrorism. First they asked the driver and then they asked me. I had an Italian ID and permanent resident papers for Algeria and they assumed I escaped from Algeria and questioned me. I was tense! The passengers were then told to step out of the car. One of the military men

A 73 626 402                    5                    December 28, 2001

ccm

jumped in the car with the driver and ordered him to pull over up ahead for a vehicle search."

"Me and the passenger were walking behind the car with military men behind us. They took us to a small hidden road off to the side of the main road. When the car stopped, he took the keys and ordered us to start walking up into the trees. He was telling us this was our "funeral". One of the military took out a big knife and proceeded to sharpen it on a stone, me and the two others were panicking, and looking at each other wondering what we could do. The driver asked if they would let him say a prayer before he dies. So they let him. While he was praying, another military group came along and killed one of the men holding us. I was hiding behind trees and bushes and with me was one of the military men who was going to kill us. They were shooting back and forth so I pushed the guy out who was hiding with me and he was shot down."

"At the same time as I pushed him out, I jumped into a culvert while being shot at. I stayed in the culvert for some time. After the shooting stopped, I heard someone yelling "Retreat! Retreat!". I do not know who was yelling to who I was so scared. I didn't know who was gone and who wasn't. One of the new group came to me and told me everything was okay and was comforting me. He was another terrorist group against this one. We were allowed to leave. We were cut up and scratched, but alive and proceeded to Algeria to my home. After two days, I

A 73 626 402                                6                          December 28, 2001

ccm

received a letter threatening my life saying an eye for an eye. Since I pushed that guy behind the tree, now I was to die. I fled back to Italy, and didn't return home for quite a while."

"In 1997, while in Italy, I decided to return to Algeria and see my family. At first everything seemed all right so I returned to Italy. But upon a second visit, three men came looking for me. They questioned neighbors and one of the neighbors who was a friend came and told me. He said they were at his house and wanted me to come. My suspicion was aroused so very quietly I snuck over and recognized one of the men as one in the first terrorist group. I escaped again going to my aunt's house. Days later I received another threatening letter stating they would find me no matter where I went. I returned to Italy, got a visa and came to the U.S."

Attached to the respondent's I-589 is another document. It doesn't refer to any number or part in the I-589, which reads as follows: "In my country you don't know in whom to believe, in government or political groups. The government uses undercover militia to eliminate groups of people and government officials. The government also intimidates the people and robs them. There are a lot of terrorist groups. Each group has different ideas. Some are for the government. Some are against them. And you never know which is what. This is a revelation to some officials in power that now have escaped and told their stories to news people and magazine publishers."

A 73 626 402                           7                    December 28, 2001

ccm

   Part C, question 2 of the respondent's I-589 asked the question have you or any member of your family ever belonged to or been associated with any organizations or groups in your home country, etc.? "Yes" is checked off with the following written in: "(Pax-Rcd) My aunt is a member of the (parties) as well as a journalist." Part C, question 3 of the I-589 asked the question have you or any member of your family ever been mistreated or threatened by the authorities in your home country or a group or groups that are controlled by the government or that the government of your country is unable or unwilling to control? "Yes" is checked off. "Religion" is checked off. "Political opinion" is checked off. With the following written in: "My aunt wrote a book about a woman whose son was killed by a terrorist and was seeking revenge." Part C, question 4 of the I-589 asked the question have you or any member of your family ever been accused, charged, arrested, detained, interrogated, convicted, sentenced, imprisoned in your country or any other country, including the United States? "Yes" is checked off with the following written in: "I was arrested for assault and battery in the U.S. against my ex-wife and for technical default on 12-7-1998. One year later on 9-30-99 INS came and got me."

   Part C, question 5 of the I-589 asked the question do you fear being subjected to torture in your own country or any other country if your return? "Yes" is checked off with the following written in: "See attached pages." Part C, question 6

A 73 626 402          8           December 28, 2001

ccm

of the respondent's I-589 asked the question what do you think would happen to you if you return to the country from which you claim you would be subjected to persecution? With the following written in: "Same as above." Part C, question 7 states describe in detail your trip to the United States from your home country. "Yes" is checked off with the following written in: "I came from Italy with visa fiancé."

Part D, question 6 asked the question are you filing an application more than one year after your last arrival in the United States? "Yes" is checked off with the following written in: "I did not speak any English and was not familiar with the law."

Exhibit 8 in the record contains the country reports on human rights practices for Algeria from the Department of State dated February 2001. A review of that document refers to the government of Algeria, the strife that was going on in Algeria between Muslim fundamentalists against the government, trying to overthrow the Algerian government. The country reports on human rights practices as contained in Exhibit 8 does not refer to the respondent or any members of his family.

Exhibit 9 in the record is a letter addressed to the respondent signed by the respondent, dated February 27, 2001, which states in pertinent part: "This missive is in response to settle any question you may have concerning my signature and the explanation attached to form pertaining to my fear of torture and

ccm

persecution. The explanation I gave for fear of torture and persecution was a true statement with my signature. Although the explanation narrated by myself was written by an individual, and for reasons unknown does not want his identity revealed. The reason I narrated the explanation to this person is due to my illiteracy to write English. Which Your Honor should be aware of as well as the District Attorney."

Exhibit 10 in the record is a motion in the name of the respondent asking for a speedy hearing in order to be deported from the United States.

Exhibit 14 in the record is an Amnesty International report for November 1997 concerning Algeria. A review of that document reflects the civilian population caught in a spiral of violence which raged on in Algeria between the government and the Muslim fundamentalists seeking to overthrow the Algerian government. A review of that document does not refer to the respondent or any members of his family.

Group Exhibit 15 in the record contains restraining orders and violations of restraining orders in the name of the respondent with appeals from those restraining orders concerning the respondent's previous marriage to a Deborah Sunderman. Group Exhibit 15 in the record reflects that the respondent appealed convictions for violation of restraining orders which are currently on appeal.

In a removal hearing held before the undersigned on

ccm

February 27, 2001, the respondent testified upon being questioned by the Government's attorney that he was born on December 20, 1968; that he entered the United States one time on July 13, 1997; prior to July 13, 1997 he was living in Italy; that he lived in Italy seven and a half years; that he started living in Italy in 1990; that he has no passport; that he lost his passport in 1998; that he lived in Italy from 1990 to 1997; that except for living in Algeria he did not live in any other country besides Italy and Algeria; that he did not live in Algeria between 1990 and 1997; that he did not live in any other country during that period of time; that he had lawful residence in Italy from 1990 through 1997; that he was a legal permanent resident of Italy; that he filled out an application for permanent residence; that he never applied for asylum or refugee status in Italy; that he was working in Italy for a small company; that he does not remember if the company filed papers for him in Italy; that he first entered Italy in 1990 as a tourist; that six to 10 months later he got permanent resident status in Italy; that he was a permanent resident alien in Italy; that he was a permanent resident alien in Italy when he left Italy; that he returned to Algeria while living in Italy; that he returned to Algeria four, five or six times; he can't remember; that he was in Algeria two or three months before coming to the U.S.; that while visiting Algeria he had problems; that he doesn't remember about those problems because of what happened to him since; that he doesn't

A 73 626 402                          11                    December 28, 2001

ccm

remember the year or date of what happened to him in Algeria; that it was three and a half years to six years ago what happened to him as stated in his asylum application; that he returned to Algeria after what happened to him in Algeria; that he returned to Algeria two times after what happened to him in Algeria previously; that he was not in any other country other than Italy and Algeria; that people came looking for him after what happened to him in Algeria as stated in his application for asylum; that he doesn't know who they are; that they are a group; he doesn't know who they belonged to; that he is afraid of these people; that he came to the U.S. as a non-immigrant K-1 fiancé; that he married a United States citizen; that the marriage was annulled; that he is not married presently; that he was denied a green card by the Immigration and Naturalization Service; that he did not file asylum until 2000 because he did not know and he had no help; that he has family in Algeria; that his father, mother and brothers are in Algeria; that he has five brothers; that he doesn't know where his brothers are in Algeria; that his father and mother are in Algeria; that he went to see his family from Italy in Algeria; that he stayed 15 days to one month; that he had no other problems in Algeria except what happened to him as stated in his asylum application; that he was never in the Algerian military; that he was called for the military in Algeria; that he can't remember when; it was before going to Italy; that he reported for military duty; that he can't

ccm

remember, but it was before going to Italy; that he was not accepted for military service in Algeria; that he doesn't know why; that he never belonged to any groups in Algeria; that he does not know about his family in Algeria; that he last had contact with his family in Algeria in 1999; that he has no sisters; that he is not presently married; that he was in a cab in Algeria and that the cab stopped at a checkpoint; that he was stopped by military personnel; that they passed that checkpoint; that they came to a second checkpoint and at the second checkpoint they were in military dress; that they were in Algerian military dress; that he does not know who the persons were at the second checkpoint; that they were in military dress at the second checkpoint; that they were questioned; that he was asked to get out of the cab along with another passenger; that the driver stayed in the cab and they told the driver to drive the cab off the road; that he and the other passenger walked behind; that one of them showed a knife and the others were armed with weapons; that one was sharpening a knife; that he was asked about his political affiliation and the government of Algeria; that he did not answer; that the driver answered their questions; that the questions were addressed to all of them but the driver was the only one who answered questions; that they took his identification card, a permit to reside in Algeria; that no money or jewelry was taken from him; that a different group came along; they were dressed in military dress; they were dressed

A 73 626 402                                13                           December 28, 2001

ccm

differently than the first military group at the first checkpoint; that he never saw them before or since; that he saw one person after that incident two or three months after coming back to Algeria in 1997 before going to the United States; that he doesn't know the person; that this person came looking for him and he saw the person from afar.

In a removal hearing held before the undersigned on August 7, 2001 the respondent further testified upon being questioned by the Government's attorney that he doesn't remember the date he was stopped at the first checkpoint; that he was living in Italy for six and a half years before that incident; that the second checkpoint was two or three kilometers from the first checkpoint; that he doesn't know the time frame between the first and second checkpoints; that he doesn't know who people were at the second checkpoint; that they were in uniforms and a group arrived at the second checkpoint; that the group had military uniforms at the second checkpoint; that at the second checkpoint when there was the fighting, he hid himself and that the groups were shooting at each other; that he jumped into a stream of water; that 10 or 12 persons were in the second group; that he did not hear any conversation but heard shooting between the groups; that he hid himself when the shooting started; that he hid with a person who was with the first group; that the man had a small gun and a big gun; that he pushed the man and then hid; that the man was killed and he found him killed; after the

ccm

removal will be denied.

Respondent applied for the Convention Against Torture. Article III of the U.N. Protocol of 1967 which the United States has ascribed to requires that the respondent not be removed to Algeria if the respondent can show that he will be tortured at the hands of the Algerian government or any agents thereof. Based on the foregoing and what is contained in the record, I find that the respondent has not submitted one scintilla or iota of evidence to establish that he has been tortured in the past at the hands of the Algerian government or any agents thereof nor has he shown that he will be subjected to torture if he were to be removed to Algeria at the hands of the Algerian government or any agents thereof. Based on the foregoing and what is contained in the record, his application for the benefits of the Convention against Torture, Article III of the U.N. Protocol of 1967, will be denied.

The respondent applied for voluntary departure in lieu of removal. Voluntary departure is a privilege and not a right. Every alien who applies for voluntary departure must show that they have the funds in which to depart, they will depart promptly, they are persons of good moral character for five years preceding the filing of their applications for voluntary departure and that their applications for that relief should be granted as a matter of discretion. The record in this case reflects that the respondent came to the United States as a

A 73 626 402                              19                       December 28, 2001

ccm

fiancé of a United States citizen who he went through a marriage with, which marriage was subsequently annulled by the United States citizen.  The respondent has, according to the record, violated restraining orders, eight in total, which were requested by his ex-United States citizen wife and that he has appealed those convictions which are violations of restraining orders. Notwithstanding the respondent's appeal of those convictions for violations of restraining orders, I find based on the record in this case that the respondent is not deserving of voluntary departure as a matter of discretion and his application for that relief will be denied as a matter of discretion.

      Respondent declined to designate a country to which his removal be directed if required.  The respondent is a native and citizen of Algeria and his removal will be directed to Algeria. The respondent has indicated according to the record that he has landed immigrant status or permanent resident status in Italy and if the respondent cannot be removed to Algeria for any reason, he will be ordered removed to Italy.  The respondent has not indicated in the proceedings that he is fearful of being removed to Italy.

<u>ORDER</u>

      IT IS ORDERED that the respondent's application for political asylum be and the same is hereby denied.

      IT IS FURTHER ORDERED that the respondent's application for withholding of removal be and the same is hereby denied.

A 73 626 402                  20                  December 28, 2001

## CERTIFICATE PAGE

I hereby certify that the attached proceeding before

THOMAS M. RAGNO, in the matter of:

ABDELAZIZ BENNOUR

A 73 626 402

Boston, MA

was held as herein appears, and that this is the original

transcript thereof for the file of the Executive Office for

Immigration Review.

_____
(Consuella Miles, Transcriber)

Deposition Services, Inc.
6245 Executive Boulevard
Rockville, Maryland  20852
(301) 881-3344

_____March 6, 2002_____
(Completion Date)