UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
Boston, Massachusetts

File No.:  A 73 626 402                      December 28, 2001

In the Matter of
                                )
ABDELAZIZ BENNOUR,              )   IN REMOVAL PROCEEDINGS
                                )
          Respondent            )

CHARGE:        Section 237(a)(1)(B) of the Immigration and
               Nationality Act, as amended -- Non-immigrant --
               remained longer than permitted

APPLICATION:   Withholding of removal; voluntary departure and
               the Convention Against Torture

ON BEHALF OF RESPONDENT:        ON BEHALF OF SERVICE:

Pro se                          Susan J. Hiller, Esquire
                                Assistant District Counsel
                                Immigration and Naturalization
                                   Service
                                Boston, Massachusetts

### ORAL DECISION OF THE IMMIGRATION JUDGE

          Respondent is a 33-year-old, single male alien, native
and citizen of Algeria who was admitted to the United States at
New York, New York on July 13, 1997 as a non-immigrant fiancé
with authorization to remain in the United States for a temporary
period not to exceed October 12,1997.

          Respondent has conceded allegations 1 through 3 in his
Notice to Appear, Exhibit 1 in the record, are true as stated,
which read as follows: "(1) You are not a citizen or national of

ccm

the United States.  (2) You're a native of Algeria and a citizen
of Algeria.  (3) You were admitted to the United States as at New
York, New York on or about July 13, 1997 as a non-immigrant
fiancé with authorization to remain in the United States for a
temporary period not to exceed October 12, 1997."  Respondent
denied the truthfulness of allegations 4 and 5 in his Notice to
Appear, which read as follows:  "(4) On April 20, 1998 your
application for permanent residence based on your marriage to
Deborah Sunderman was denied.  (5) You remained in the United
States beyond October 12, 1997 without authorization from the
Immigration and Naturalization Service."  The respondent denied
that he is subject to removal on the charge contained in his
Notice to Appear, which reads as follows:  "Section 237(a)(1)(B)
of the Immigration and Nationality Act (Act), as amended, in that
after admission as a non-immigrant under Section 101(a)(15) of
the Act you have remained in the United States for a longer time
than permitted."

        The burden is on the Government to establish that the
allegations in the Notice to Appear are true as stated and that
the respondent is subject to removal on the charge contained
therein by evidence which is clear and convincing.  See the
Immigration and Nationality Act of 1990, as amended; 8 C.F.R. §
242.14.

        Exhibit 2 in the record contains the respondent's I-94
showing he was admitted to the United States as a fiancé on July

A 73 626 402                    2              December 28, 2001

ccm

13, 1997 without authorization to remain in the United States
until October 12, 1997.  The document reflects that the
respondent is a citizen of Algeria born December 20, 1968,
containing the respondent's name.  Exhibit 3 in the record
contains the denial application for permanent residence in the
name of the respondent dated April 20, 1998.  Exhibit 4 in the
record contains an annulment judgment in the name of the
respondent which was filed by the woman that he married, Deborah
A. Sunderman, dated July 17, 1998.

        Based on the foregoing and what is contained in the
record, I find that the respondent is not a citizen or national
of the United States, but a native and citizen of Algeria who was
admitted to the United States at New York, New York on July 13,
1997 as a non-immigrant fiancé with authorization to remain in
the United States for a temporary period not to exceed October
12, 1997, whose application for permanent residence was denied on
April 20, 1998, and that the respondent has remained in the
United States beyond October 12, 1997 without authorization from
the Immigration and Naturalization Service.  I further find that
the respondent is subject to removal on the charge contained in
his Notice to Appear by evidence which is clear and convincing.

        Respondent applied for discretionary relief in the form
of withholding of removal, voluntary departure and the Convention
Against Torture.  The respondent has submitted an application,
form I-589, initially requesting asylum.  The respondent is

A 73 626 402                    3                December 28, 2001

ccm

statutorily ineligible for asylum.  The respondent filed his
application, form I-589, before the Immigration Judge
undersigned, as reflected in Exhibit 7, on May 16, 2000.  The
respondent was required to submit that application within a year
of December 9, 1998.  The respondent has not submitted any
evidence or documentation to establish why he did not file that
application within the one year.  There is nothing in this record
to establish that the respondent is excused from filing that
application.  Consequently, he is statutorily ineligible to apply
for political asylum.

Assuming that it was concluded from the record that the
respondent was excused from the one year filing deadline and he
was statutorily eligible to apply for asylum, his application for
that relief will be visited by the undersigned as set forth in
the record.

Exhibit 7 in the record is form I-589 which, for
purposes of the decision, assuming that the respondent was found
to be eligible to apply for asylum, will be entertained as an
asylum application, application for withholding of removal and
the Convention Against Torture.  Review of Exhibit 7 reflects the
following: respondent was born on December 20, 1968 in Algiers,
Algeria; that his marital status is not indicated; that he is an
Algerian national at the present and was born in Algeria; that he
last left his country in 1997 and that he entered the United
States with a fiancé visa at New York, New York on July 13, 1997

A 73 626 402                        4                    December 28, 2001

ccm

with authorization to stay in the United States until October 12,
1997. A review of the respondent's I-589 reflects that he
attended a school in Italy with no dates given. The I-589
indicates that the respondent's parents are both natives and
citizens of Algeria located in Alger, presumably Algeria. Part
C, question 1 of the form I-589 asked the question why are you
seeking asylum with the following written in: "The reason I am
seeking asylum and withholding deportation is I was living in
Italy from 1990 to 1997 and I returned to my own country,
Algeria, with residence papers from Italy. One day I was
visiting my friends outside of Algeria about 45 or 55 kilometers
in Davira. I took a taxi to get back home. When I was in the
taxi, there was the driver, another passenger and myself. Along
the way the military border patrol stopped us and asked us for
papers, IDs and licenses, etc. All was fine."

        "Further down the road, there was another border
patrol. All was not fine with them. They were military
impersonators. I recognized this when they asked for papers and
we produced what they wanted. They continued to ask us questions
individually asking where we were coming from, where we were
going, did we support the government or terrorism. First they
asked the driver and then they asked me. I had an Italian ID and
permanent resident papers for Algeria and they assumed I escaped
from Algeria and questioned me. I was tense! The passengers
were then told to step out of the car. One of the military men

A 73 626 402                    5                  December 28, 2001

ccm

jumped in the car with the driver and ordered him to pull over up ahead for a vehicle search."

"Me and the passenger were walking behind the car with military men behind us.  They took us to a small hidden road off to the side of the main road.  When the car stopped, he took the keys and ordered us to start walking up into the trees.  He was telling us this was our "funeral".  One of the military took out a big knife and proceeded to sharpen it on a stone, me and the two others were panicking, and looking at each other wondering what we could do.  The driver asked if they would let him say a prayer before he dies.  So they let him.  While he was praying, another military group came along and killed one of the men holding us.  I was hiding behind trees and bushes and with me was one of the military men who was going to kill us.  They were shooting back and forth so I pushed the guy out who was hiding with me and he was shot down."

"At the same time as I pushed him out, I jumped into a culvert while being shot at.  I stayed in the culvert for some time.  After the shooting stopped, I heard someone yelling "Retreat!  Retreat!".  I do not know who was yelling to who I was so scared.  I didn't know who was gone and who wasn't.  One of the new group came to me and told me everything was okay and was comforting me.  He was another terrorist group against this one. We were allowed to leave.  We were cut up and scratched, but alive and proceeded to Algeria to my home.  After two days, I

A 73 626 402                          6                    December 28, 2001

ccm

received a letter threatening my life saying an eye for an eye. Since I pushed that guy behind the tree, now I was to die.  I fled back to Italy, and didn't return home for quite a while."

"In 1997, while in Italy, I decided to return to Algeria and see my family.  At first everything seemed all right so I returned to Italy.  But upon a second visit, three men came looking for me.  They questioned neighbors and one of the neighbors who was a friend came and told me.  He said they were at his house and wanted me to come.  My suspicion was aroused so very quietly I snuck over and recognized one of the men as one in the first terrorist group.  I escaped again going to my aunt's house.  Days later I received another threatening letter stating they would find me no matter where I went.  I returned to Italy, got a visa and came to the U.S."

Attached to the respondent's I-589 is another document. It doesn't refer to any number or part in the I-589, which reads as follows:  "In my country you don't know in whom to believe, in government or political groups.  The government uses undercover militia to eliminate groups of people and government officials. The government also intimidates the people and robs them.  There are a lot of terrorist groups.  Each group has different ideas. Some are for the government.  Some are against them.  And you never know which is what.  This is a revelation to some officials in power that now have escaped and told their stories to news people and magazine publishers."

A 73 626 402                        7                  December 28, 2001

ccm

              Part C, question 2 of the respondent's I-589 asked the

question have you or any member of your family ever belonged to

or been associated with any organizations or groups in your home

country, etc.?  "Yes" is checked off with the following written

in:  "(Pax-Rcd) My aunt is a member of the (parties) as well as a

journalist."  Part C, question 3 of the I-589 asked the question

have you or any member of your family ever been mistreated or

threatened by the authorities in your home country or a group or

groups that are controlled by the government or that the

government of your country is unable or unwilling to control?

"Yes" is checked off.  "Religion" is checked off.  "Political

opinion" is checked off.  With the following written in:  "My

aunt wrote a book about a woman whose son was killed by a

terrorist and was seeking revenge."  Part C, question 4 of the I-

589 asked the question have you or any member of your family ever

been accused, charged, arrested, detained, interrogated,

convicted, sentenced, imprisoned in your country or any other

country, including the United States?  "Yes" is checked off with

the following written in:  "I was arrested for assault and

battery in the U.S. against my ex-wife and for technical default

on 12-7-1998.  One year later on 9-30-99 INS came and got me."

              Part C, question 5 of the I-589 asked the question do

you fear being subjected to torture in your own country or any

other country if your return?  "Yes" is checked off with the

following written in:  "See attached pages."  Part C, question 6

A 73 626 402                      8              December 28, 2001

ccm

of the respondent's I-589 asked the question what do you think
would happen to you if you return to the country from which you
claim you would be subjected to persecution?  With the following
written in: "Same as above."  Part C, question 7 states describe
in detail your trip to the United States from your home country.
"Yes" is checked off with the following written in:  "I came from
Italy with visa fiancé."

        Part D, question 6 asked the question are you filing an
application more than one year after your last arrival in the
United States?  "Yes" is checked off with the following written
in:  "I did not speak any English and was not familiar with the
law."

        Exhibit 8 in the record contains the country reports on
human rights practices for Algeria from the Department of State
dated February 2001.  A review of that document refers to the
government of Algeria, the strife that was going on in Algeria
between Muslim fundamentalists against the government, trying to
overthrow the Algerian government.  The country reports on human
rights practices as contained in Exhibit 8 does not refer to the
respondent or any members of his family.

        Exhibit 9 in the record is a letter addressed to the
respondent signed by the respondent, dated February 27, 2001,
which states in pertinent part:  "This missive is in response to
settle any question you may have concerning my signature and the
explanation attached to form pertaining to my fear of torture and

A 73 626 402                    9                    December 28, 2001

ccm

persecution.  The explanation I gave for fear of torture and
persecution was a true statement with my signature.  Although the
explanation narrated by myself was written by an individual, and
for reasons unknown does not want his identity revealed.  The
reason I narrated the explanation to this person is due to my
illiteracy to write English.  Which Your Honor should be aware of
as well as the District Attorney."

          Exhibit 10 in the record is a motion in the name of the
respondent asking for a speedy hearing in order to be deported
from the United States.

          Exhibit 14 in the record is an Amnesty International
report for November 1997 concerning Algeria.  A review of that
document reflects the civilian population caught in a spiral of
violence which raged on in Algeria between the government and the
Muslim fundamentalists seeking to overthrow the Algerian
government.  A review of that document does not refer to the
respondent or any members of his family.

          Group Exhibit 15 in the record contains restraining
orders and violations of restraining orders in the name of the
respondent with appeals from those restraining orders concerning
the respondent's previous marriage to a Deborah Sunderman.  Group
Exhibit 15 in the record reflects that the respondent appealed
convictions for violation of restraining orders which are
currently on appeal.

          In a removal hearing held before the undersigned on

A 73 626 402                  10              December 28, 2001

ccm

February 27, 2001, the respondent testified upon being questioned
by the Government's attorney that he was born on December 20,
1968; that he entered the United States one time on July 13,
1997; prior to July 13, 1997 he was living in Italy; that he
lived in Italy seven and a half years; that he started living in
Italy in 1990; that he has no passport; that he lost his passport
in 1998; that he lived in Italy from 1990 to 1997; that except
for living in Algeria he did not live in any other country
besides Italy and Algeria; that he did not live in Algeria
between 1990 and 1997; that he did not live in any other country
during that period of time; that he had lawful residence in Italy
from 1990 through 1997; that he was a legal permanent resident of
Italy; that he filled out an application for permanent residence;
that he never applied for asylum or refugee status in Italy; that
he was working in Italy for a small company; that he does not
remember if the company filed papers for him in Italy; that he
first entered Italy in 1990 as a tourist; that six to 10 months
later he got permanent resident status in Italy; that he was a
permanent resident alien in Italy; that he was a permanent
resident alien in Italy when he left Italy; that he returned to
Algeria while living in Italy; that he returned to Algeria four,
five or six times; he can't remember; that he was in Algeria two
or three months before coming to the U.S.; that while visiting
Algeria he had problems; that he doesn't remember about those
problems because of what happened to him since; that he doesn't

A 73 626 402                    11              December 28, 2001

ccm

remember the year or date of what happened to him in Algeria;
that it was three and a half years to six years ago what happened
to him as stated in his asylum application; that he returned to
Algeria after what happened to him in Algeria; that he returned
to Algeria two times after what happened to him in Algeria
previously; that he was not in any other country other than Italy
and Algeria; that people came looking for him after what happened
to him in Algeria as stated in his application for asylum; that
he doesn't know who they are; that they are a group; he doesn't
know who they belonged to; that he is afraid of these people;
that he came to the U.S. as a non-immigrant K-1 fiancé; that he
married a United States citizen; that the marriage was annulled;
that he is not married presently; that he was denied a green card
by the Immigration and Naturalization Service; that he did not
file asylum until 2000 because he did not know and he had no
help; that he has family in Algeria; that his father, mother and
brothers are in Algeria; that he has five brothers; that he
doesn't know where his brothers are in Algeria; that his father
and mother are in Algeria; that he went to see his family from
Italy in Algeria; that he stayed 15 days to one month; that he
had no other problems in Algeria except what happened to him as
stated in his asylum application; that he was never in the
Algerian military; that he was called for the military in
Algeria; that he can't remember when; it was before going to
Italy; that he reported for military duty; that he can't

A 73 626 402                    12              December 28, 2001

ccm

remember, but it was before going to Italy; that he was not
accepted for military service in Algeria; that he doesn't know
why; that he never belonged to any groups in Algeria; that he
does not know about his family in Algeria; that he last had
contact with his family in Algeria in 1999; that he has no
sisters; that he is not presently married; that he was in a cab
in Algeria and that the cab stopped at a checkpoint; that he was
stopped by military personnel; that they passed that checkpoint;
that they came to a second checkpoint and at the second
checkpoint they were in military dress; that they were in
Algerian military dress; that he does not know who the persons
were at the second checkpoint; that they were in military dress
at the second checkpoint; that they were questioned; that he was
asked to get out of the cab along with another passenger; that
the driver stayed in the cab and they told the driver to drive
the cab off the road; that he and the other passenger walked
behind; that one of them showed a knife and the others were armed
with weapons; that one was sharpening a knife; that he was asked
about his political affiliation and the government of Algeria;
that he did not answer; that the driver answered their questions;
that the questions were addressed to all of them but the driver
was the only one who answered questions; that they took his
identification card, a permit to reside in Algeria; that no money
or jewelry was taken from him; that a different group came along;
they were dressed in military dress; they were dressed

A 73 626 402                    13              December 28, 2001

ccm

differently than the first military group at the first
checkpoint; that he never saw them before or since; that he saw
one person after that incident two or three months after coming
back to Algeria in 1997 before going to the United States; that
he doesn't know the person; that this person came looking for him
and he saw the person from afar.

In a removal hearing held before the undersigned on
August 7, 2001 the respondent further testified upon being
questioned by the Government's attorney that he doesn't remember
the date he was stopped at the first checkpoint; that he was
living in Italy for six and a half years before that incident;
that the second checkpoint was two or three kilometers from the
first checkpoint; that he doesn't know the time frame between the
first and second checkpoints; that he doesn't know who people
were at the second checkpoint; that they were in uniforms and a
group arrived at the second checkpoint; that the group had
military uniforms at the second checkpoint; that at the second
checkpoint when there was the fighting, he hid himself and that
the groups were shooting at each other; that he jumped into a
stream of water; that 10 or 12 persons were in the second group;
that he did not hear any conversation but heard shooting between
the groups; that he hid himself when the shooting started; that
he hid with a person who was with the first group; that the man
had a small gun and a big gun; that he pushed the man and then
hid; that the man was killed and he found him killed; after the

A 73 626 402                    14                   December 28, 2001

ccm

shooting was over, he found the man he had pushed dead; that he doesn't know who the second group was; that they were not part of the government; that he doesn't know who the first group were; that he left Algeria and went to Italy a few days after that incident; that he returned to Algeria after three or four years after that incident; that he saw a person in the second group upon his return to Algeria from Italy three or four years later; that he thereafter returned to Italy again and stayed in Italy two or four months; that none of his family were contacted by the groups; that he returned to Algeria two times after the incident where the two groups were fighting; that the man who was in the second group was looking for him; that he came to his house looking for him in Algeria where his mother, father and siblings live; that he escaped after they were looking for him; that nothing happened to him or his family after the man was looking for him; that he got a letter threatening his life; that he assumed that it was from the people looking for him; that they did not identify themselves in the letter; that the letter was sent by mail; that it was addressed in Algeria and sent to his parent's address; that the letter was received after the man was looking for him; that he stayed in Algeria one week after getting the letter; that he left Algeria after receiving the letter three or four days later; that he is afraid to return to Algeria because of those people; that they know him, but he doesn't know them; that he doesn't have a copy of the letter. Respondent

A 73 626 402                     15                     December 28, 2001

Case 1:04-cv-12149-MLW   Document 29-2   Filed 12/15/2004   Page 16 of 22


ccm

further testified that he did not tell his family what happened
to him after he returned to Algeria from Italy, that is,
concerning what happened to him in Algeria between the two
groups.

The burden is on the respondent in these proceedings to
establish that if were to return to Algeria that he will be
persecuted or has a well-founded fear of persecution on account
of any one of the following: race, religion, nationality,
membership in a particular social group or political opinion.
The respondent bears the burden of establishing that if he were
to return to Algeria he will be persecuted for any one of those
aforementioned reasons based on a reasonable person similarly
situated as the respondent.

The respondent claims that if he returns to Algeria he
will be in harm's way because of what happened to him when he was
in Algeria in an incident when he was in a taxi and that after
being stopped at a checkpoint and at a second checkpoint there
was fighting between two groups at each other in which the
respondent was not involved in and one of them was killed.  And
that thereafter, he received a threat that he would be killed
based on an eye for an eye as stated in his asylum application
and that he left Algeria and went to Italy, returned to Algeria
and upon his return received a letter which he does not have,
which letter was addressed to his parent's house.  Presumably
from the person who the respondent claims was looking for him

A 73 626 402                    16              December 28, 2001

ccm

after he returned to Algeria from Italy on a prior occasion prior
to 1997.

          Aside from the respondent's self-serving declaration,
there is no evidence in the record to support the respondent's
declaration of what happened to him in Algeria and why he is
fearful of returning to Algeria.  I have observed the demeanor of
the respondent during the time he has testified in these
proceedings and find his testimony not to be credible in that his
answers to questions were evasive and his answers were not
responsive to the questions asked and his answers, for the most
part, were rambling.  The respondent's testimony in these
proceedings is at variance with what is contained in his
application for asylum and withholding as previously recited and
this decision will not be revisited.  A reasonable person
similarly situated as the respondent, based on this record, would
not fear persecution for any one of those aforementioned reasons
if they were to return to Algeria.  The respondent claims that he
got a letter threatening his life presumably, but he has no
letter.  The respondent testified according to his application
for asylum that he saw this person which he was involved with
three or four years later and he identified him from afar.  I
find that kind of testimony along with the rest of the
respondent's testimony to be incredulous.  I cannot believe that
the respondent, assuming that what he is saying is true, would
have gone back to Algeria as he has testified he went back to.  A

A 73 626 402                    17                  December 28, 2001

ccm

reasonable person would have never gone back to Algeria if the respondent was threatened as he claims he was. I find that the respondent's self-serving declaration of what happened to him is a story made up so that he would not have to return to Algeria.

Based on the foregoing and what is contained in the record, I find that a reasonable person similarly situated as the respondent would not be persecuted or have a well-founded fear of persecution for any one of those aforementioned reasons nor for what is stated in the asylum application, form I-589, documentation in support thereof and the respondent's testimony in these proceedings. Consequently, his application for political asylum will be denied as a matter of discretion.

Respondent applied for withholding of removal. The Attorney General of the United States is required to withhold a respondent's removal to Algeria if the respondent can show that his life or freedom will be threatened if removed to Algeria for any one of those aforementioned reasons. The respondent bears the burden of establishing by a "clear probability" that if he were to be removed to Algeria that his life or freedom will be threatened for any of those aforementioned reason. Since I have concluded that the respondent has not met the lesser burden of showing he merits political asylum, it follows that he has not met the higher burden of showing he merits withholding of removal. Consequently, based on the foregoing and what is contained in the record, his application for withholding of

A 73 626 402                    18                    December 28, 2001

ccm

removal will be denied.

Respondent applied for the Convention Against Torture.
Article III of the U.N. Protocol of 1967 which the United States
has ascribed to requires that the respondent not be removed to
Algeria if the respondent can show that he will be tortured at
the hands of the Algerian government or any agents thereof.
Based on the foregoing and what is contained in the record, I
find that the respondent has not submitted one scintilla or iota
of evidence to establish that he has been tortured in the past at
the hands of the Algerian government or any agents thereof nor
has he shown that he will be subjected to torture if he were to
be removed to Algeria at the hands of the Algerian government or
any agents thereof. Based on the foregoing and what is contained
in the record, his application for the benefits of the Convention
against Torture, Article III of the U.N. Protocol of 1967, will
be denied.

The respondent applied for voluntary departure in lieu
of removal. Voluntary departure is a privilege and not a right.
Every alien who applies for voluntary departure must show that
they have the funds in which to depart, they will depart
promptly, they are persons of good moral character for five years
preceding the filing of their applications for voluntary
departure and that their applications for that relief should be
granted as a matter of discretion. The record in this case
reflects that the respondent came to the United States as a

A 73 626 402                    19              December 28, 2001

ccm

fiancé of a United States citizen who he went through a marriage with, which marriage was subsequently annulled by the United States citizen.  The respondent has, according to the record, violated restraining orders, eight in total, which were requested by his ex-United States citizen wife and that he has appealed those convictions which are violations of restraining orders. Notwithstanding the respondent's appeal of those convictions for violations of restraining orders, I find based on the record in this case that the respondent is not deserving of voluntary departure as a matter of discretion and his application for that relief will be denied as a matter of discretion.

Respondent declined to designate a country to which his removal be directed if required.  The respondent is a native and citizen of Algeria and his removal will be directed to Algeria. The respondent has indicated according to the record that he has landed immigrant status or permanent resident status in Italy and if the respondent cannot be removed to Algeria for any reason, he will be ordered removed to Italy.  The respondent has not indicated in the proceedings that he is fearful of being removed to Italy.

ORDER

IT IS ORDERED that the respondent's application for political asylum be and the same is hereby denied.

IT IS FURTHER ORDERED that the respondent's application for withholding of removal be and the same is hereby denied.

A 73 626 402                20                December 28, 2001

ccm

IT IS FURTHER ORDERED that the respondent's application for the Convention Against Torture be and the same is hereby denied.

IT IS FURTHER ORDERED that the respondent's application for voluntary departure be and the same is hereby denied.

IT IS FURTHER ORDERED that the respondent be removed from the United States of America to Algeria on the charge contained in his Notice to Appear.

IT IS FURTHER ORDERED that if Algeria will not accept the respondent into its territory for any reason, the respondent will be ordered removed to Italy, the country of his permanent resident status, on the charge contained in the Notice to Appear.

THOMAS M. RAGNO
Immigration Judge

A 73 626 402                    21                December 28, 2001

<u>CERTIFICATE PAGE</u>

I hereby certify that the attached proceeding before

THOMAS M. RAGNO, in the matter of:

ABDELAZIZ BENNOUR

A 73 626 402

Boston, MA

was held as herein appears, and that this is the original

transcript thereof for the file of the Executive Office for

Immigration Review.


_Consuella Miles_
(Consuella Miles, Transcriber)

            Deposition Services, Inc.
            6245 Executive Boulevard
            Rockville, Maryland  20852
            (301) 881-3344


            March 6, 2002
            (Completion Date)